THE REFORMED CHURCH OF GALLUPVILLE, Appellant, *v.* SHERMAN SCHOOLCRAFT et al., Respondents.

*It seems* that the only method by which a religious corporation can divide its real estate and vest a portion thereof in a part of its congregation set off from the parent organization is by legislative enactment.

A resolution, however, of the governing body of the parent society, purporting to transfer a portion of its real estate to the new organization, is sufficient to lay the foundation of an adverse possession.

Where the officers and members of the new society take possession of the premises allotted to it, and thereafter, without being formally incorporated, occupy, claiming to own them, and subsequently a corporation is duly organized under the general act providing for the organization of religious corporations (chap. 60, Laws of 1813), it succeeds by virtue of that act (§ 4), without formal conveyance, to the property of the society and to all property held for its use, and it has the benefit of the former possession. (DWIGHT. C., dissenting.)

Although the unincorporated society could not acquire title by adverse possession, its officers could for its benefit, and when the corporation is duly organized the prior possession may be tacked to its own to establish its title under the statute of limitations. (DWIGHT, C., dissenting.)

*It seems* that since the passage of the act authorizing religious corporations to sell their real estate, upon the order of the chancellor, such sales can only be considered as against public policy when unauthorized by the proper tribunal. (DWIGHT, C., dissenting.)

But even if, against public policy, such a corporation may lose title by adverse possession, the statute of limitations operates as well against corporations as natural persons. Mere incapacity to convey is not one of the excepted disabilities preventing its operation, and courts cannot add to the exceptions upon any supposed reason of public policy. (DWIGHT, C., dissenting.)

*Magdalen College Case* (6 Coke, 67) distinguished.

One taking title to real estate by adverse possession cannot be said to take by conveyance or grant, but by the statute which gives him the title and protects him against the person otherwise having it by depriving the latter of any remedy. (DWIGHT, C., dissenting.)

A deed conveying certain premises to a religious corporation reserved a right to build a basement story upon the premises, to be used solely for the purposes of a school, with a right of passage to and from; the grantee to build a church upon the basement walls; a privilege was given to it to purchase the basement. *Held,* that the deed vested a fee in the grantee, with the reservation of an easement merely; that the right to the basement was not forfeited by an omission to use it, or by a use of it for other than school purposes; but that any persons occupying the basement for other than school purposes could be removed by action of ejectment at the suit of the corporation, the judgment awarding possession subject to the easement.

*Reformed Church of Gallupville* v. *Schoolcraft et al.* (5 Lans., 206) reversed.

(Argued January 5, 1875; decided May term, 1875.)

APPEAL from order of the General Term · of the Supreme Court in the third judicial department setting aside a verdict in favor of plaintiff, and granting a new trial. (Reported below, 5 Lans., 206.)

This action was ejectment to recover the basement of a church. The material facts are as follows : The High Dutch Reformed Church of Schoharie was an old church organization, whose records extended back as far as the year 1730. It had transacted business as a regular church corporation, and had a corporate seal. For many years the church edifice of this organization was located at Schoharie, about six miles from Gallupville, and the people at Gallupville attended that church. Afterward, the congregation built a new church at Schoharie Court House; and then the old church was abandoned and the people who belonged to the congregation residing at Gallupville attended the new church. Finally, in 1835, it was deemed best to build a church at Gallupville for the accommodation of the portion of the congregation who resided

there; and, in April of that year, Ezra Gallup and John Wheeler, with their wives, executed to the High Dutch Reformed Church of Schoharie a conveyance of the real estate described in the complaint. The deed, after the description of the premises, contained this clause:

"And hereby reserving a right or privilege to Ezra Gallup, junior, above named, to grant a right in the above named and described premises, by his indenture, to a certain company, on the following conditions: to build a basement story on the above named and described premises, forty-two feet by fifty-five feet square, and wall to be of stone, not to exceed ten feet in hight, for the purpose of keeping a select and other schools in only, together with a privilege on said lot of land for the scholars of said schools to play, pass and repass on, together with the teachers and others that may want to go to said school room; the said basement story is to be built under the High Reformed Church, to be built on said above-named and descibed premises within the term of three years, as is hereafter named, and said church to be built on the walls of the said basement story above mentioned, of which said company above named, John Wheeler, Robert Coates, junior, and John P. Becker were unanimously chosen trustees for building said basement story, and for the purpose of hiring a teacher or teachers, and to preside over said school or schools only as in their judgment they may see proper to encourage; and hereby reserving to their successors in office, as trustees, the same right and privileges as is granted to the above-named trustees, now in office, forever; the said basement story or school room is not to be occupied for holding religious meetings in, of any kind, by any denomination, while owned by said company above mentioned, nor by order of their respective trustees at no time hereafter; and hereby making the above reserve subject to the following conditions: that if the congregation of the High Dutch Reformed Church, above named, should at any time hereafter want to purchase the said above-mentioned basement story under said church, with all the privileges thereunto belonging, then said company above

mentioned is bound to sell and convey back, by virtue of their respective trustees, the said basement story to the said congregation of the High Dutch Reformed Church for the first cost of the same, and interest that may be due from the time of building the same, if the said school room should not rent for money enough to pay said interest on said sum it cost to build said basement story for the use of keeping school in only, etc., together with all and singular the hereditaments and appurtenances thereunto in any wise appertaining; and the reversion and reversions, remainder and remainders, rents, issues and profits thereof, to have and to hold the said above-described premises unto the said parties of the second part, and them and their successors, to be appropriated to all purposes necessary to convenience of a church or house of public worship to be erected thereon, with a basement story under the same for the use of schools, etc., and for no other use or purpose whatever."

In 1835, the basement was built upon the land mentioned in the deed, by persons interested in having a school, under the direction of the school trustees to whom Ezra Gallup had made a conveyance of the right reserved ; and after the basement was built, the church was erected thereon, and completed in the year 1836, by the High Dutch Reformed Church of Schoharie. Afterward, the same minister officiated at Schoharie and Gallupville, and the congregation remained united until 1844. In that year, proceedings were taken to divide the congregation and to organize a society at Gallupville, with a separate minister for that society; and, on the twenty-seventh day of June, there was an adjourned meeting of the consistory, at which the following proceedings were had, as appears from the records of the church.

" After the business connected with the foregoing reports, accounts, etc., was disposed of, consistory resumed the consideration of the subject connected with the application of the Gallupville church to be separated from this church.

"And whereas, at the last meeting of consistory application was made by and in behalf of the eastern part of the congre-

gation usually worshipping at the Gallupville church, in the town of Schoharie, for the assent of consistory to be separated and set apart that they might be organized into a separate and distinct congregation;

"And whereas, the consistory then postponed the consideration of said application and appointed this 27th day of June, 1844, for a meeting of the great consistory and heads of families for the purposes of counsel, and to be advised in the premises, and of which meeting general notice was given; and now, at this day, at the church of said congregation, in the Schoharie Court House village, the place to which this meeting was postponed, at a very general attendance of the consistory, and also of the great consistory and heads of families of said congregation, the said application having been fully discussed, both as to spiritual and temporal benefits to be derived by a separation from the parent or mother church and congregation, the said consistory, after general consultation and advice, and upon full consideration of the premises, unanimously

"*Resolved,* That it is expedient and proper that all that part of the congregation east of a northerly and southerly line from the mouth of what is commonly called the Lousekill, be henceforth separated from the parent or mother church and congregation, and that the same may be organized into a separate and distinct church and congregation, according to the rules and ordinances of the constitution of the Reformed Dutch Church."

And as to the temporalities, property and effects of the congregation it was unanimously

"*Resolved,* That the building or edifice called the Gallupville church, together with all and singular the appurtenances thereunto belonging, shall henceforth belong to and be the exclusive property of that part of the congregation hereinbefore designated as a separate and distinct congregation, to have and to hold the same to them and to their successors in office forever; and that they shall also receive of the property and effects of said congregation $700 as and for their full and

equal share thereof, which is to be turned out to them in certain promissory notes for moneys loaned by the congregation, and for the deficiency in amount, if any, to be paid in cash, and if more to be paid and refunded to the parent or old congregation, out of which sum, however, they are to pay all debts and liabilities incurred for the founding, building and erecting the said Gallupville church ; and that all and singular the residue and remainder of the temporalities, property and effects of the said congregation, to wit, the old stone church and the lot on which it stands, and the adjoining cemetery or burying ground, and the parish house and glebe, commonly called the minister's house and land, containing altogether about thirteen acres of land ; and also the new church and lot on which the church is erected in the Schoharie Court House village, together with all and singular the appurtenances thereunto severally belonging, shall henceforth continue to remain and belong to, and be the exclusive property of, the parent church, or old part of the congregation, now in efficient operation, to have and to hold the same to them and their successors in offices forever, subject, nevertheless, that they pay all debts, liabilities for building and erecting the said new church in the Schoharie Court House village, and subject, also, to the payment of debts for ministerial religious services rendered in both churches, hereinbefore incurred, except for the current year's salary of the Rev. Paul Weidman, which is to be paid, two-thirds thereof by the old or parent church and one-third thereof by that part now separated and to be organized as a new congregation."

All subscriptions for and toward the building and erecting the Gallupville church, and the new church in the Schoharie Court House village, and not yet paid, are reserved to the respective churches.

After which, it was resolved, that classis be requested to meet as soon as practicable, for the purpose of ratifying the above proceedings, and to organize a new Reformed Dutch Church at Gallupville."

After the church was erected at Gallupville school was

kept in the basement for some years, but for several years before the commencement of this suit no school had been kept therein. After division of the congregation in 1844 the society at Gallupville maintained a separate minister, and that society was incorporated in April, 1869. About two years before the commencement of this suit the sons of temperance, of which these defendants were members, without, so far as appears, any authority from any one, took possession of the basement and occupied the same for their weekly meetings. Before the commencement of this action the defendants were notified and requested to vacate and deliver up possession of the basement, which they declined to do.

At the close of plaintiff's evidence, defendants' counsel moved for a nonsuit upon various grounds, among which were, that the plaintiff had not shown facts constituting a cause of action; that it had not shown that defendants were in possession of the premises at the time of the commencement of the action, or that they ever claimed any interest therein or title thereto; that the title to the premises was in the High Dutch Church of Schoharie and not in the plaintiff. The nonsuit was denied and defendants excepted. At the close of all the evidence defendants again moved for a nonsuit upon the same grounds, and upon the ground that, from the time the first grant was made, for more than twenty years this church had acquiesced in the use of the basement under the grant. The judge denied the motion and defendants' counsel excepted. The judge then stated that he would direct a verdict for the plaintiff to recover the premises, to which ruling defendants' counsel also excepted, and he claimed "that defendants should have a verdict, because neither in the complaint nor in the answer, nor upon the trial, had there been any sort of dispute as to who owns the fee under the basement, and submitted and objected that a verdict in ejectment for possession of the premises did not decide any thing, for if the technical fee is in the plaintiff, which is not disputed, the easement for the enjoyment of the basement is in the defendants; but that is not reached by a verdict, and for

these reasons object to verdict in this form, which objections and claims of the defendants' counsel were severally over-ruled by the judge," and defendants' counsel excepted, and the judge declined, upon defendants' request, to submit to the jury the question whether, upon the evidence, defendants withheld possession of the premises. The judge then directed a verdict for plaintiff, and defendants excepted. A verdict was rendered accordingly. Exceptions were ordered to be heard at first instance at General Term.

*Hobart Krum* for the appellant.    The fact of Wheeler and Gallup being in possession, claiming title and exercising acts of ownership over the land conveyed, was sufficient evidence of title in them to authorize them to make a valid conveyance. (*Pitney* v. *Leonard*, 1 Paige, 461; *Blunt* v. *Aikin*, 15 Wend., 525.) Possession under the deed having been undisturbed over thirty-five years, it is too late to question the authority of the grantors. (1 Greenl. Ev., § 2; 14 Mass., 257.) The High Dutch Church of Schoharie was a corporation by prescription, and the legality of its corporate existence is presumed. (*Robie* v. *Lodywick*, 35 Barb., 326; 6 Kent's Com., 277; A. &. A. on Corp., 64, 65, § 70; *Dillingham* v. *Lewis*, 7 Mass., 547; *Stockbridge* v. *West Stockbridge*, 12 id., 400; *All Saints' Ch.* v. *Lovett*, 1 Hall, 141.) It could take and hold by deed whether incorporated or not. (A. & A. on Corp., § 37; *Pawlet* v. *Clark*, 9 Cranch, 294; 3 Pet., 114; 1 Greenl., 271; 7 Mass., 44; 2 R. S. [5th ed.], 607, § 4; Laws 1813, chap. 60 § 4; *Green* v. *Cady*, 9 Wend., 414.) The existence of this corporation could not be questioned collaterally. (*Doyle* v. *P. Pet. Co.*, 44 Barb., 239; *Eaton* v. *Aspinwall*, 19 N. Y., 121; *R. R. Co.* v. *Cary*, 26 id., 77; *Paper Wks.* v. *Willett*, 19 Abb., 416; *Ins. Co.* v. *Osgood*, 1 Dun., 708.) The action of the High Dutch Reformed Church in 1844, and possession under it by plaintiff for over twenty years, vested in plaintiff all the right, title and interest in the property said church then owned. (*Flora* v. *Carbran*, 38 N. Y., 111; *Howard* v. *Howard*, 17 Barb., 663; *La Frombois* v. *Jackson*, 8 Cow.,

589; *Marble* v. *McMinn*, 57 Barb., 610; *Jackson* v. *Todd*, 2 Cai., 183; *Jackson* v. *Ellis*, 13 J. R., 118; *Jackson* v. *Newton*, 18 id., 355; *Mosher* v. *Yost*, 33 'Barb., 277; *Bradstreet* v. *Clark*, 12 Wend., 602; *Finlay* v. *Cook*, 45 Barb., 10, 23; *Jackson* v. *Bowen*, 1 Cai., 358; *Jackson* v. *Elston*, 12 J. R., 452; *Jackson* v. *Vermilyea*, 6 Cow., 678; 2 Hil. on R. P., 430; *Miller* v. *Garlock*, 8 Barb., 153; 6 Abb. Dig., 7, sub. 6; *Wilklow* v. *Lane*, 37 Barb., 249; *Van Derzee* v. *Van Derzee*, 30 id., 331; *Howard* v. *Howard*, 17 id., 663; *Jackson* v. *Johnson*, 5 Cow., 74; *Wager* v. *Troy Un. R. R. Co.*, 25 N. Y., 526.) Plaintiff's possession of the basement was sufficient to enable it to maintain this action as against defendants. (*Jackson* v. *Hubble*, 1 Cow., 613; *Jackson* v. *Harder*, 4 J. R., 202; *Jackson* v. *Rowland*, 6 Wend., 671; *Clute* v. *Voris*, 31 Barb., 511, 515; 3 R. S. [5th ed.], 592, §§ 4, 7; 25 N. Y., 526; *Shaver* v. *McGraw*, 12 Wend., 557; *Bauyer* v. *Empie*, 5 Hill, 48; *People* v. *Ambuck*, 11 Abb., 97; Code, § 142.)

*Nathaniel C. Moak* for the respondents. Plaintiff could not recover on the theory of a prior possession, or of a valid title to the church property. (Code, § 81; *Tyler* v. *Heydorn*, 46 Barb., 463, 464; *Robie* v. *Sedgwick*, 35 id., 319; *Layman* v. *Whiting*, 20 id., 559; *Sahler* v. *Signer*, 37 id., 329; *Sanders* v. *Leary*, 38 id., 76; *Montgomery* v. *Johnson*, 9 How Pr., 232; *Bundy* v. *Birdsall et al.*, 29 Barb., 31, 33, 34; *Van Schaack* v. *Third Ave. R. R. Co.*, 25 How., 459; *Collins* v. *Suau*, 7 Robt., 623, 633; *Meth. Soc. of Georgetown* v. *Bennett*, 39 Conn., 293; 1 R. S., 738, § 137; 1 Edm. Stat., 689; 3 Washb. R. P., 300, 597, 598 [m. p.]; *Babcock* v. *Utter*, 1 Keyes, 409; *Alex. Presb.* v. *Presb., etc.*, 46 How., 312; 1 R. S., 738, § 138; 1 Edm. Stat., 689; *Fonda* v. *Sage*, 49 Barb., 116, 123, 124; *Wyatt* v. *Benson*, 23 id., 333–335; Laws 1813, p. 218, § 1; 3 Edm. Stat., 694; *Montgomery* v. *Johnson*, 9 How. Pr., 236; *Mad. Ave. Bap. Ch.* v. *Bap. Ch.*, 1 Abb. [N. S.], 214; 46 N. Y., 131.) Neither the High Dutch Reformed Church, the new congregation nor plaintiff ever

had any title whatever to the basement. (*Wait* v. *Wait*, 4 N. Y., 101; *Peck* v. *Claflin*, 105 Mass., 420; *Wakeley* v. *Davidson*, 26 N. Y., 394; *Borst* v. *Empie*, 5 id., 33, 39; *Ottumwa Lodge, etc.,* v. *Lewis*, 34 Iowa, 76; *Bauldwin* v. *Alexander*, 15 Wall., 131, 137; 1 Washb. R. E., 12 [m. p., 4]; *Webster* v. *Potter*, 105 Mass., 414; *Doe* v. *Burt*, 1 T. R., 701; *Pomfret* v. *Rocroff*, 1 Saund., 320, *f ;* 1 Wms. Notes to Saund. R. [ed. 1871], p. 558, note° *a ; Harris* v. *Rydnig*, 5 M. &. W., 71; *Otis* v. *Smith*, 9 Pick., 293, 297, 298; *Stockwell* v. *Hunter*, 11 Met., 448; *Proprs. Meetinghouse* v. *City of Lowell*, 1 id., 541; *Loring* v. *Bacon*, 4 Mass., 575, 576.)   Plaintiff had no right to maintain ejectment for the strip between the highway and church lot. (*Bundy* v. *Birdsall*, 29 Barb., 34.)

EARL, C.   It was not disputed on the argument before us that the High Dutch Reformed Church of Schoharie was properly incorporated, and that it took title to the premises upon which the church was erected at Gallupville by the deed of Gallup and Wheeler, dated April 15, 1835.   That corporation built a church upon the premises and continued to occupy them, using both the church at Schoharie and Gallupville until June, 1844, when, at a meeting of its consistory, proceedings were taken to divide the congregation represented by the corporation, and a division was made setting off from the parent congregation that portion of the congregation residing at and near Gallupville, so that a distinct society might there be organized according to the rules and constitution of the Reformed Dutch Church.   At the same meeting of the consistory, a resolution was also adopted dividing the property of the corporation and setting off and transferring to the society at Gallupville the church and premises there covered by the deed above mentioned.   This resolution could not operate as a conveyance for at least two reasons.   There was no grantee, or no individual was named as grantee, and there was no corporation to take, and the conveyance was not authorized by the chancellor or any law.   Probably the only

way by which the corporation could have divided its real estate and vested a portion thereof in a part of the congrega tion set off from the parent organization, would have been by act of the legislature. (*Madison Avenue Baptist Church* v. *Baptist Church in Oliver Street*, 46 N. Y., 131; Laws of 1813, chap. 60, § 11.)

Hence the High Dutch Church of Schoharie was not divested of the premises in question by the act of its con- sistory. But the imperfect and invalid conveyance attempted by the consistory was sufficient to lay the foundation of an adverse possession. Possession under an invalid conveyance, with a claim of title, is adverse to the grantor, and if con- tinued for twenty years will bar the grantor's right of entry or recovery. (*Bradstreet* v. *Clarke*, 12 Wend., 602, 674; *Clapp* v. *Brumagham*, 9 Cow., 530; *La Frombois* v. *Jack- son*, 8 id., 589; 3 Wash. on Real Prop., 148.) It is the pos- session under claim of right to which the law attaches most significance, and if such possession commenced under a writ- ten instrument of any kind, however imperfect it may be, it may be looked to for the purpose of showing the character and extent of the possession and claim, and the intent with which the entry was made.

The society at Gallupville took possession of the premises in 1844, and thereafter occupied them, claiming to own them, until April, 1869, about twenty-five years, and then it was regularly incorporated, and the plaintiff as such corporation succeeded in the possession of the premises. The society manifestly claimed and possessed just what was conveyed to the High Dutch Church of Schoharie, and during the whole time the society held adversely to that church; and while there was no formal conveyance to the plaintiff, it was so far in privity with the society that it has the benefit of the former possession. The corporation, when formed by virtue of sec- tion 4 of chapter 60 of the Laws of 1813, succeeded without any formal conveyance to all the property of the society and to all property held for its use. (*Baptist Church in Hart- ford* v. *Witherell*, 3 Paige, 296.) The case must be treated

as if the society organized the corporation and transferred to it all the right and possession which it had. In such a case, as the law is settled in this State, there is such a continuity and privity of possession and estate as will enable the last posesssor to tack to his possession the prior possession, so as to establish his title by adverse possession. (*Jackson* v. *Moore*, 13 Johns., 513; *Jackson* v. *Thomas*, 16 id., 294; *Simpson* v. *Downing*, 23 Wend., 316; *Winslow* v. *Newell*, 19 Vt., 164; *Smith* v. *Chapin*, 31 Conn., 530; Ang. on Lim., § 414.) In 2 Smith's Leading Cases, 600, the American editors say "that in New York, Vermont and Massachusetts possessions may be tacked, if one comes in under the other and the possessory estates are connected and continuous."

It is objected to the views here expressed that prior to the incorporation of the Gallupville society the voluntary unincorporated society could not acquire title by adverse possession. This is doubtless true. A society of persons which could not take title by grant could not acquire it by adverse possession; but the individuals who compose such a society may acquire title by adverse possession. This society was, from 1844 to 1869, composed of the same individuals or persons claiming in succession under the same title, and in the same right. It at all times had officers, either the same or in succession, who managed its affairs and actually controlled and possessed its property, and could have been sued in an action of ejectment. Such officers could at any time have taken a grant for the benefit of the society, and could acquire title by adverse possession for the benefit of the society. When the corporation was formed in 1869, all difficulty was removed, and it had the benefit of the prior possession, and took the title.

The statute of limitations, as to real estate, is founded upon public policy. It is a statute of repose, and intended to quiet and settle titles, and operates against corporations as well as natural persons, and even against the State. As enacted in our State, its terms are very sweeping, and it would include all owners of real estate but for the exceptions of natural per-

sons under the disabilities mentioned in the statute ; and mere incapacity, for any reason, to convey is not the foundation of any of the disabilities. It is said, in 2 Greenleaf's Cruise on Real Property (454), "that ecclesiastical corporations, and generally all ecclesiastical persons, seized in right of their churches, being restrained from alienation by several positive laws, are not *quoad* the estates whereof they are seized in right of their churches, within any of the statutes of limitations, and therefore cannot bar their successors by neglecting to bring actions for recovery of their possessions within the time prescribed by these statutes ; but an ecclesiastical person who is guilty of this neglect will himself be barred." The only authority cited to sustain this text is the *Magdalen College Case* (6 Coke, 67). In that case, the master of the college conveyed a certain house to Queen Elizabeth in the seventeenth year of her reign, notwithstanding the statute passed in the thirteenth year of the same reign, which enacted " that from thenceforth all leases, gifts, grants, feoffments, conveyances or estates to be made, had or suffered by any master and fellows of any college, dean and chapter of any cathedral or collegiate church, master or warden of any hospital, parson, vicar, or any other having any spiritual or ecclesiastical living, or any houses, lands, titles, tenements or other hereditaments, being parcel of any such college, church, cathedral, hospital, rectory, vicarage, or any spiritual living, etc., to any person or persons, etc., shall be utterly void and of no effect, to all intents, constructions and purposes." Subsequently the queen conveyed, and her grantee .conveyed to the Earl of Oxford, and he being seized thereof, one Broughton and wife levied a fine of the house to him with proclamations, and the question was, whether his title thus became good against the college. It was held that the conveyance to the queen was in violation of the statute, and that the title was not perfected in the earl by the fine. The decision was based upon the ground that the fine was a conveyance "permitted or suffered " by the master and fellows of the college, and that the statute was violated not only when they suffered a recovery against them-

selves, as parties thereunto, but generally, according to the letter of the statute, when they suffered others to levy a fine with proclamations. The decision was based upon the letter of the statute, that a conveyance was " suffered "—a fine being a feoffment of record. A person who takes title to real property by adverse possession cannot be said, in any proper sense, to take it by conveyance or grant. Such a person simply takes the position which the law assigns him. The law, in effect, gives him a title, and protects him against the person otherwise having the title by depriving such person of any remedy. It was said, in that case, to be against the public policy of England for ecclesiastical corporations and persons to convey their real estate, and thus defraud their successors and deprive the public of the benefit of such property, and hence alienations by them were totally prohibited. What was there said about public policy had reference to the construction to be given to the statute of Elizabeth under consideration. It was claimed, on behalf of the title of the Earl of Oxford, that the statute did not prohibit an alienation to the queen, because she was not named therein, according to the general canon of construction, that the sovereign being a part of the legislative power, was not bound by any act of parliament, unless named therein by special and particular words; but it was held that that statute, founded upon public policy, and made to preserve important public rights, should be construed to prohibit alienation to the sovereign as well as to private individuals. It was not decided that because the alienation in that case was against public policy, therefore the statute of limitations should not apply. It was simply decided that the alienation to the queen was within the prohibition of the statute, and that the fine was a species of conveyance suffered and permitted, and hence that that did not give the Earl of Oxford title.

It is probably true that the restraining statute of Elizabeth became a part of the common law of this State, and that, prior to our general law upon the subject, no religious corporation could convey its real estate without an act of the legislature.

(*Madison Avenue Baptist Church* v. *Baptist Church in Oliver Street, supra.*) But since our statute authorizing the sale of the real estate of religious corporations upon the order of the chancellor, it cannot be said to be against public policy for such corporations to sell their real estate, for such sales are expressly permitted. Such sales are simply against public policy, unless authorized by the proper tribunal, in the same way that the sale of the lands of infants is against public policy, unless authorized by some court.

But suppose it be conceded that the sale of the real estate of religious corporations is against public policy, and to be, on that account, absolutely prohibited, could they not still lose title by adverse possession? As above stated, the statute of limitations is founded upon public policy. It has been part of the public policy of all civilized nations (except the Jewish), that long continued possession of the soil, under claim of right, should bar a recovery by the true owner, and no legislative action has been more universally sanctioned by the practice of nations and States, and popular approbation, than that exercised for quieting a long, undisputed possession of the soil. (Angell on Lim., §§ 8, 9.) The common-law maxim, *Nullus tempus occurrit regi*, has, for more than 200 years, ceased to be fully operative in England. The repose of titles is considered more important than the sovereign right of States and kings. Here are two laws, one prohibiting the alienation of real estate by religious corporations, and the other providing that "no action for the recovery of real property, or for the recovery of the possession thereof, shall be maintained, unless it appears that the plaintiff, his ancestors, predecessor or grantor was seized or possessed of the premises in question within twenty years before the commencement of such action." (Code, § 78.) Both laws are founded upon public policy. There is no collision between the two. The latter applies to corporations as well as individuals, and why should it not have effect according to its terms, and the policy upon which it is founded in all cases be upheld? Who shall determine that it is more important to the public

that such corporations shall forever retain their lands than it is to uphold the title to lands long in undisputed possession? I can perceive no just reason for engrafting an exception upon the statute which its language clearly does not warrant. The legislature has incorporated in the statute all the exceptions which were deemed important, and the courts should not add to them upon any supposed reason of public policy. If public policy requires that religious corporations should be exempted from the operation of the statute of limitations, the legislature, and not the courts, should provide for the exemption.

It follows, therefore, that while the High Dutch Reformed Church of Schoharie did not, by any proper conveyances, divest itself of the title to the premises at Gallupville, it lost its title by adverse possession, and the plaintiff acquired the title. What title to the premises did the plaintiff get? I answer, the same which was conveyed to the High Dutch Reformed Church of Schoharie by the deed of April 15, 1835. Neither it nor the society which preceded it, so far as I can discover, ever claimed more. Upon the argument before us plaintiff's counsel did not claim more, and I do not understand that defendants' counsel disputed that if plaintiff had any rights they were such as the High Dutch Reformed Church of Schoharie would have had if it had continued in possession of the premises, and had been plaintiff. It therefore becomes necessary to construe the deed to that church. That deed, excepting as reserved therein, conveys the premises described to the High Dutch Reformed Church of Schoharie. The reservation is of a "right or privilege" to Ezra Gallup, Jr., one of the grantors, "to grant a right" in the premises to a certain company, upon certain conditions, to wit: To build a basement story on the premises, of certain dimensions, to be used for the sole purpose of keeping school therein, with the right of passage to and from the basement over the lot for teachers, scholars and others to go to and from the school room; the basement to be under the church, and the religious society to build the church on the walls of the basement. The deed also contains a pro-

vision that if the church society should at any time desire to purchase the basement story, it could do so by paying the cost of the same. Taking all the provisions of the deed together, I entertain no doubt that the fee of the lands described was vested in the grantee, and that the reservation was of an easement to build upon the land the basement story, and use and occupy the same for school purposes until such time as the grantee should desire to purchase the basement, when, upon payment of the cost thereof, the rights reserved should be conveyed and cease. The church had no right to possess or use the basement room for any purpose. The possession and use of that was under the control of the school trustees. The right to the basement was not forfeited or lost by any omission to use it. Neither was it forfeited by any use of it for other than school purposes. The church could, probably, by injunction, restrain any other use of it, and could doubtless sue any person who passed over their land to the basement to use it for any other purpose. The fee and the possession of the land was in the plaintiff, subject to the easement, and any use of the premises for any other purpose than that mentioned in the reservation was a wrong to the plaintiff, to be redressed in a proper action.

The school trustees had no interest in the land, except the right to have the basement and school room remain there, and to have access thereto. When the scholars and teachers were in the school room, they were upon plaintiff's premises, in the enjoyment of the easement reserved. When defendants were there they were upon plaintiff's premises without any right, and I am of opinion that they could be removed by action of ejectment. Suppose a merchant should open a store in the basement or a family should move in for residence, what is the plaintiff to do in such a case? I entertain no doubt that it would have a remedy by ejectment. It is true that an action of ejectment will lie only in case the plaintiff had at the time of the commencement of the action a right of entry into the premises claimed and the right to the possession thereof. But the owner of the fee of a public highway in

which the public have an easement for travel may maintain ejectment to recover the land within the limits of the highway, against any one who has appropriated the same to a purpose not authorized by the easement, and in such action the sheriff can execute the judgment by delivering possession subject to the easement. (*Goodtitle* v. *Alker*, 1 Burrows, 133; *Etz* v. *Daily*, 20 Barb., 32; *Brown* v. *Gulley*, Lalor's Sup. to H. & D., 308; *Wager* v. *Troy Un. R. R. Co.*, 25 N. Y., 526; *Lozier* v. *The N. Y. C. R. R. Co.*, 42 Barb., 465.) In this case the defendants were upon plaintiff's premises, possessing and withholding the same, and as they did not in any way connect themselves with the easement or the owners thereof, it was proper to award the possession of the premises to the plaintiff.

The possession of the defendants at the time of the commencement of the action was alleged in the complaint, not denied in the answer, and was therefore admitted. I am, therefore, of opinion that the verdict directed at the Circuit was right, and that the order of the General Term should be reversed and judgment ordered upon the verdict for plaintiff, with costs.

DWIGHT, C. (dissenting). This is an action of ejectment brought by the plaintiff to recover the possession of the basement of a church edifice in Gallupville, Schoharie county.

I think that the High Dutch Reformed Church of Schoharie, under which the plaintiff claims, must be deemed to be incorporated. There has been an exercise of corporate powers so long and continuous that it must be deemed to have a charter by prescription. (1 Black. Com., 473; 2 Coke's Inst., 330; Angell and Ames on Corp., §§ 69, 70, and cases cited.) The use of corporate powers dates back to a period of fifty years before the American revolution, when the common-law doctrines of prescription must be presumed to have been recognized.

This organization had the title to the *locus in quo*. The conveyance of Gallup and Wheeler of April 15, 1835, con-

veyed the premises on which the basement stands, reserving a " right or privilege to the grantor, Gallup, to grant a right in the above-named premises, by his indenture to a certain company, on the following conditions :   To build a basement story on the above-named premises, of prescribed dimensions, for the purpose of keeping a select or other school *only*, with a privilege on said lot for the scholars, teachers, etc., to pass and repass over said land ; the basement story to be built on the premises within three years, and the church to be built on the basement." The basement story was not to be occupied for holding religious meetings of any kind. The High Dutch Church was to have the right to purchase the basement at first cost and interest.

At the same date (April 15, 1835), Gallup conveyed to three persons, named as trustees of a corporation, according to the reservations in the conveyance to the High Dutch Church.

Under these conveyances it cannot be doubted that the *land*, before any building was erected, belonged in fee to the High Dutch Church. That body took it burdened with a right or privilege to have a basement story erected upon it by others, and with an obligation to erect a church structure over the basement ; *prima facie*, these were merely restrictions upon the mode of use of the land, and did not change the ownership otherwise existing in the church. It is, of course, true that one person may own the basement of a building and another may own the superstructure, each owning in fee ; whether this is true in any particular case is a question of construction upon the instrument. The reasonable interpretation of the present deed is that it simply conveys an easement. No *estate* is reserved to the grantor, but only a right to convey to the trustees. The trustees have no exclusive use of the property as would be natural in conveyances of the fee. They can use the basement for school purposes only. The scholars and teachers have but a privilege to pass over the land to approach and resort to the school room. Taking the whole transaction together, the trustees had but an easement, which could only be claimed for the exact purposes pointed

out in the grant. The present defendants had no rights in the basement, and were clearly trespassers. Having denied the rights of the plaintiffs, they are liable to an action of eject-ment, providing that the plaintiffs have any rights in the premises. If the title is still in the High Dutch Church of Schoharie, the action must, of course, be brought in its name. In further support of the view that this is an easement, it should be noticed that the trustees of the school do not have *exclusive* possession. When that is the case, the grant of the use may, in some cases, be equivalent to the grant of the soil. Thus, in *King* v. *Inhabitants of All Saints* (5 M. & S., 90), it was considered that an *exclusive* right to take the sand and gravel from the bed of a river constituted a tenement. So Lord COKE says: "If a man grant to another to dig turves in his land and to carry them away at his will and pleasure, the land shall not pass, because but part of the profit is given, for trees, vines, etc., shall not pass; but if a man, seized of land in fee, by his deed granteth to another the profit of those lands, to have and to hold to him and his heirs, the whole land doth pass; for what is the land but the profits thereof?" In another place he says: "By the grant of a 'boillourie' of salt, it is said that the soil shall pass, for it is the *whole profit* of the soil." (1 Coke upon Littleton, 4 *b*; see, also, *Earl of Bute* v. *Grindall*, 2 H. Bl., 265; *King* v. *Tolpuddle*, 4 T. R., 675; *Bent* v. *Moore*, 5 id., 322.)

According to this principle, if the party does not have an exclusive right, but enjoys possession with the general owner, the case is one of an easement. This is true of the case at bar. The trustees could only hold the room for school purposes. The church had the right of use for every other purpose except that of holding religious meetings. There was no exclusive possession by the school trustees. Their right closely resembled that of pew-holders in a church. It is per-fectly consistent with ownership in the church authorities to have the right or easement of keeping school held by another. Thus, a town may have an easement in a parish meeting-house to hold public meetings therein. (*Medford* v. *Pratt*, 4 Pick., 222; Washb. on Easements, 573.)

If the title to the property were still remaining in the church corporation as it stood in 1835, an action of ejectment would lie against the defendants claiming ownership. The next inquiry is, whether that has been transferred to the present plaintiff. It is urged by the appellant that it acquired the title of the Reformed Dutch Church in Schoharie, by the resolution of the consistory of that church in 1844.

There had been an application in behalf of the eastern part of the congregation (worshipping at the Gallupville church) to be separated and set apart, that they might be organized into a separate congregation. On careful consideration, it was resolved that all that part of the congregation east of a certain line should be separated from the parent or mother church and be organized into a separate and distinct congregation, according to the constitution of the Reformed Dutch Church, and that the building or edifice called the Gallupville church and its appurtenances be the exclusive property of that part of the congregation, to have and to hold to them and their successors in office forever. There were certain other provisions to effectuate the separation not necessary to be detailed. The classis were then requested to meet as soon as practicable for the purpose of ratifying the proceedings. It was subsequently reported to the consistory (July 29, 1844) that the request to the classis had been granted.

It may be conceded, for the purposes of this case, that the resolutions of the consistory, with the stipulations of the respective parties, were sufficient to give an equitable title to the plaintiff, provided that it had then been competent to take a title. This title would not be sufficient on which to base an action of ejectment, as the plaintiff must recover on the strength of his title in a court of law.

To make out a legal title the plaintiff relies on the statute of limitations. It asserts that it took by color of title, under the resolutions already referred to, all of the title of the parent church, and has held possession adversely for more than twenty years. It has thus, according to this claim, a valid title against all mankind, on which it can bring an action of ejectment.

There are two questions to be considered here: One is, whether an unincorporated association can hold adversely; the other, whether the statute of limitations can be applied to the title of a church? Can the statute of limitations be set up as against the Reformed Dutch Church of Schoharie?

In examining the first point it will be necessary to consider whether the unincorporated association which the plaintiff now represents could set up the statute of limitations as an affirmative claim. Suppose that the plaintiff had not been incorporated at all (though it was in 1869), could it at the present moment have urged that it had obtained a title by adverse possession? I think not, either by general rules of law or by the provisions of the Code of Procedure. By general rules of law the act of obtaining a title by adverse possession is a species of purchase, and gives a perfect title, thus having the effect of a regular conveyance. (Washb., vol. 3, pp. 145, 146.) It is so ranked by all the text-writers, and must be so from the nature of the case, there being but two modes of acquiring title to land — descent and purchase. There could not be a purchaser without legal capacity to take a title. It is well settled that an unincorporated association cannot take a legal title, whatever may be true of its capacity to be a beneficiary or *cestui que trust*. (*Thomas* v. *Marshfield*, 10 Pick., 367, 368; *Dr. Ayray's Case*, 11 Rep. [Coke], 21; *Jackson* v. *Corey*, 8 Johns., 388; *Hornbeck* v. *Westbrook*, 9 id., 74; *Harriman* v. *Southam*, 16 Ind., 190; 14 id., 89.) It could not have been fairly claimed that the grant would have inured to the benefit of individuals attending the church, as they were not named, and the intent plainly was that the use of the property should appertain to the respective attendants upon the church services from time to time. Conceding that this was a valid trust, a trustee must be found or appointed. The existence of such a trustee would be fatal to an action of ejectment brought by the beneficiaries in their own name.

If these principles are correct, it is impossible to claim that the society could get a title by force of the statute of limitations. It is of the essence of adverse possession that the

rightful owner should be kept out of possession by some person claiming title, and against whom he could bring an action to regain possession. Says Washburn : " If there is any period during the twenty years in which the person having the right of entry could not find an occupant on the land against whom he could bring or sustain an action of ejecment, technically called the 'tenant to the præcipe,' that period cannot be counted against him as part of the twenty years." (Vol. 3, 125 [3d ed.].) Whom could the Reformed Church of Schoharie have sued in the present case? Certainly not the unincorporated association, which for this reason cannot claim the benefit of the statute of limitations.

The same result is reached by an examination of the Code of Procedure. All of the sections there refer to a *person* as claiming title. (§§ 78, 79, 81, 83, 85–88). According to all ordinary rules of construction, the word " person " here means an individual, corporation or association, qualified to appear as such in court, as, *e. g.*, a joint-stock company under the statute. It can by no reasonable principles of construction be extended to an unincorporated religious body, like the church organization in question before incorporation. For these reasons, I think that the statute of limitations did not begin to run until the plaintiff was incorporated.

There is another difficulty in the case at bar. The law of this State does not permit a religious society to alienate its lands without the consent of the court. (*M. A. Baptist Church* v. *Baptist Church in O. St.*, 46 N. Y., 141.) While no such restriction may have existed at common law, statutes were passed in the reign of Queen Elizabeth expressly taking away from ecclesiastical corporations the power to sell or alienate their land. The case above cited holds that these restraining statutes were, in fact, introduced into the Colony of New York, and became operative as a part of the common law of the colony. (See, also, *Bogardus* v. *Trinity Ch.*, 4 Paige, 178; *De Ruyter* v. *Trustees of St. Peter's Ch.*, 3 Barb. Ch., 119; S. C., 3 N. Y., 239.) The statute law of the State permits the court to authorize a sale. This, however, is a sale in

the ordinary sense of the term. It does not mean a consolidation of the property of two churches, even of the same denomination, into one (see *Baptist Church Case* above); nor by parity of reasoning would it include the present case, where the main object of the transfer was to divide a single church into two distinct organizations. Such a transaction can in no proper sense be regarded as a sale

The present transfer could only be authorized by the legislature; being in its nature wholly void as opposed to public policy, the transfer by the resolutions gave no title. The statute of limitations, for a like reason, could not bar the title of the Reformed Dutch Church of Schoharie. Where there is no capacity to sell on grounds of public policy, the statute of limitations does not attach. This has been expressly held under the statute of Elizabeth restraining alienation by ecclesiastical corporations. (2 Greenlf. Cruise Dig., 262, par. 47.) It is there laid down that ecclesiastical corporations, and generally all ecclesiastical persons, seized in right of their churches, being restrained from alienation by several positive laws, are not *quoad* the estates whereof they are seized in right of their churches, within any of the statutes of limitations, and therefore cannot bar their successors by neglecting to bring actions for the recovery of their possessions within the time prescribed by those statutes. (Citing *Magdalen College Case*, 11 Coke, p. 78, *b;* see, also, Plowd., 358.)

The *Magdalen College Case* arose under the statute of 13 Elizabeth (chap. 10), restraining ecclesiastical and collegiate corporations from making conveyances of land. One question in the case was, whether a fine and proclamation in the nature of a statute of limitations would bar the title? It was held that it would not. The court said that it would have been of none effect to have prohibited them to bar the right of their colleges by conveyances made by the master and fellows, etc., and to have left them power by their permission or sufferance and non-claim to bar it. (11 Coke, p. 78, *b.*) I do not see but that this reasoning is applicable to the condition of our own law. The doctrine of the *Baptist Church*

*Case* (46 N. Y., 141), declaring that sales or transfers of church property are void unless sanctioned by the court or the legislature, as the case may be, can only be fully carried into effect by declaring that these bodies cannot *indirectly* transfer their property by permitting an intended transferee to hold adversely, and thus set up the statute of limitations. In the present case, if that were allowed (all the parties being assumed to know the law), there would be a transparent evasion of the restraining law.

On the whole, the plaintiff has no legal title in the case at bar sufficient to enable it to maintain an action of ejectment. This result makes it unnecessary to consider the other questions discussed in the argument

All concur with EARL, C., for reversal, except DWIGHT, C., dissenting.

Order reversed, and judgment ordered for plaintiff on verdict.